**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA MADEJ, | ) | CASE NO. 1:12-CV-2663 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Barbara Madej ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I. PROCEDURAL HISTORY**

On January 29, 2010, Plaintiff filed her applications for POD and DIB, alleging a disability onset of March 28, 2008. (Transcript ("Tr.") 16.) The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On May 11, 2011, an ALJ held Plaintiff's hearing.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. She is automatically substituted as the defendant in this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

(*Id*.)  Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id*.)  A vocational expert ("VE") also participated and testified.  (*Id*.)  On June 7, 2011, the ALJ found Plaintiff not disabled.  (Tr. 16-25.)  On September 18, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 25, 2012, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15.)  Plaintiff argues that substantial evidence does not support the ALJ's decision.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on November 23, 1956, and was 56 years old on the date she was last insured.  (Tr. 24.)  She had a four-year degree in sociology.  (Tr. 41.)  She had past relevant work as a case manager, customer service representative, and office clerk.  (Tr. 77-78.)

### B.  Relevant Medical Evidence

#### 1.  Treatment Notes

On March 31, 2008, Plaintiff reported to the emergency department at Kaiser Permanente in Parma ("Kaiser"), complaining of right-side weakness, trouble writing, and confusion, with an onset of symptoms approximately one week prior.  (Tr. 387.)  Kaiser physicians diagnosed her with a cerebrovascular accident ("CVA").  (Tr. 389.)  She was admitted for observation and, on April 7, 2008, a Kaiser physician performed a

general neurological examination. (Tr. 374.) The physician noted that an MRI revealed an "acute stroke" in the middle and anterior cerebral arteries. (*Id.*) Noting that Plaintiff had not experienced any further deterioration during her hospital stay and that Plaintiff was able to ambulate, the physician diagnosed Plaintiff with a stroke and stenosis of the middle cerebral artery, and discharged her. (Tr. 378.)

On May 28, 2008, psychiatrist Shila J. Mathew, M.D., examined Plaintiff, who reported difficulty concentrating after her stroke. (Tr. 356.) Plaintiff stated that she was not depressed, but was worried about returning to work and whether she would be able to perform her job. (*Id.*) Dr. Mathew noted Plaintiff's complaints regarding her ability to process information, but opined that Plaintiff had no cognitive deficits, and demonstrated good insight and judgment. (*Id.*) She diagnosed Plaintiff with depression. (Tr. 356-57.)

On June 10, 2008, Mary K. Benton, Ph.D., conducted the first part of a cognitive assessment of Plaintiff. (Tr. 342.)

On July 6, 2008, Plaintiff sought treatment from the emergency department at Akron General Hospital ("Akron General"), complaining of intermittent weakness in her right arm. (Tr. 281.) She was admitted and Akron General physicians diagnosed her with recurrent left cerebral transient ischemic attack versus stroke with associated right upper extremity weakness, and prescribed Plavix. (Tr. 290.) She remained stable throughout her admission, and was discharged on July 9, 2008, with instructions to maintain a low fat, low cholesterol diet. (Tr. 290-91.) Physicians noted that Plaintiff's acute symptoms had "essentially resolved." (*Id.*)

On August 12, 2008, Dr. Benton completed the second part of her cognitive

3

examination of Plaintiff. (Tr. 342.) In her report, Dr. Benton noted that Plaintiff had experienced her second stroke after the first part of the examination, but before the second. (*Id.*) Dr. Benton reported that, after her first stroke, Plaintiff felt clumsy, lacked motivation and interest, and had trouble concentrating and remembering. (Tr. 343.) After the second stroke, Plaintiff reported that her memory was worse, that she was forgetting to take her medications, and was "just not like she was." (*Id.*)

Dr. Benton concluded that Plaintiff's verbal memory was intact, that her intellectual abilities were in the average range, and that Plaintiff had deficits in word retrieval. (Tr. 344-45.) Dr. Benton advised that the results of her testing "need to be interpreted with some caution" due to Plaintiff "suffering a second mild stroke between the first testing session and the second." (Tr. 345.) Dr. Benton opined, "[h]owever, the overall impression is that [Plaintiff] is able to learn and retain new verbal information well, but may experience temporary recall problems when there is sufficient new task interference." (Tr. 345-46.) Dr. Benton concluded that Plaintiff was "able to work, but that she would work more effectively in a position that involves less stress and deadlines. Her mild memory, language and executive difficulties may slow her down some and stress is likely to aggravate this. In addition it is probably in the best interests of [Plaintiff's] overall health for her to work a job that involves less overtime and pressure." (Tr. 346.)

A September 12, 2008 transcranial doppler test revealed critical carotid stenosis. (Tr. 216-17.) On October 1, 2008 Rishi Gupta, M.D., performed angiography of Plaintiff's left carotid artery. (Tr. 219.)

On October 8, 2008, a Kaiser physician examined Plaintiff, who was complaining

of right shoulder pain.  (Tr. 390.)  Plaintiff reported a history of dislocations of her right shoulder after trauma as a teenager.  (Tr. 391.)  An x-ray of Plaintiff's right shoulder revealed an oblique anterior glenoid screw that was impinging on the medial humeral neck, as well as severe humeral head deformity and compression, loss of glenohumeral space, and large inferior axillary glenohumeral spurs.  (Tr. 392.)  The physician diagnosed Plaintiff with end stage arthritis in her right shoulder, and recommended that Plaintiff undergo physical therapy.  (*Id*.)  The physician noted that Plaintiff was an "eventual candidate for shoulder arthroplasty," but not at that time, "due to excellent r[ange] o[f] m[otion]."  (*Id*.)  Plaintiff underwent a cortisone injection.  (*Id*.)

On January 19, 2009, Dr. Mathew examined Plaintiff, who reported that her employer was not able to accommodate the restrictions she required after her second stroke, and was depressed and anxious about supporting herself and the possibility that she would have another stroke.  (Tr. 339.)  Plaintiff's "[w]orst fear [was] losing her job."  (*Id*.)  Dr. Mathew diagnosed Plaintiff with major recurrent depression, and recommended that she undergo individual psychotherapy.  (*Id*.)  Dr. Mathew prescribed Zoloft and instructed Plaintiff to continue using Ativan to control her anxiety.  (*Id*.)

On June 16, 2009, Dr. Gupta examined Plaintiff in follow up to her October 2008 stenting procedure.  (Tr. 242-43.)  Plaintiff reported that she had no new symptoms.  (Tr. 243.)  She reported that, although she had stopped smoking after the stenting procedure, she had since resumed smoking five to six cigarettes per day.  (*Id*.)  Dr. Gupta advised Plaintiff to stop smoking, to discontinue the Plavix and begin an aspirin regimen, and to return in one year for a follow-up appointment.  (Tr. 245.)

Plaintiff returned to Dr. Mathew on December 17, 2009.  (Tr. 336.)  Plaintiff reported that her stress had increased as a result of her father's failing health and other family situations.  (Tr. 336-37.)  Dr. Mathew noted that Plaintiff was "depressed and sad and tearful."  (Tr. 337.)  Because Zoloft made Plainitff "more shaky," Dr. Mathew prescribed desipramine, which Plaintiff had taken previously.  (*Id.*)  Dr. Mathew noted that Plaintiff's insight and judgment were intact, and that Plaintiff had "[n]o thought disorder."  (*Id.*)

On November 22, 2010, Dr. Mathew completed a medical source statement.  (Tr. 441-42.)  She assigned Plaintiff a fair ability to: follow work rules; use judgment; deal with the public; relate to co-workers; interact with supervisors; understand, remember and carry out simple job instructions; maintain her appearance; socialize; behave in an emotionally stable manner; relate predictably in social situations; manage her funds and schedules; and leave home on her own.  (*Id.*)  Dr. Mathew assigned Plaintiff a poor ability to: maintain attention and concentration for extended periods of two-hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember and carry out complex – as well as detailed, but not complex – instructions.  (*Id.*)  With respect to the clinical findings that supported her assessment, Dr. Mathew noted "depression, anxiety, cognitive difficulty due to her

6

stroke, etc." (Tr. 442.)

### 2. Agency Reports

On April 6, 2010, agency consultant Steven J. Meyer, Ph.D., performed a psychiatric review technique and a mental residual functional capacity ("RFC") assessment. (Tr. 394-411.) He diagnosed Plaintiff with depression, and assigned her moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 397, 404.) He assigned her a mild limitation in activities of daily living. (Tr. 404.) He opined that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. (Tr. 408-09.) Dr. Meyer concluded that Plaintiff could "receive instructions and ask questions appropriately in a work setting. She can cope with routine changes in a work setting that is not fast paced. [Plaintiff] can perform simple/moderately complex routine[s], with intermittent/occasonal interactions with others." (Tr. 410.)

On April 20, 2010, agency consultant W. Jerry McCloud performed a physical RFC assessment. (Tr. 412-19.) Dr. McCloud opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; and stand and/or walk and sit for about six hours in an eight-hour workday. (Tr. 413.) He concluded that Plaintiff "can lift and carry 10 pounds. She can sit for 30 minutes. She is able to push a grocery cart." (Tr. 417.)

7

**C.     Hearing Testimony**

   **1.     Plaintiff's Hearing Testimony**

At her May 5, 2011 administrative hearing, Plaintiff testified as follows:

Plaintiff split her time between her deceased father's house, her sister's house and her fiancé's house. (Tr. 37.) She maintained her father's house by keeping it clean and by making certain that no one had broken into it. (Tr. 39, 40.) Her nieces and nephews performed yard work for her there. (Tr. 41.) Although she had a current driver's license, Plaintiff did not drive frequently, as she was easily confused, forgot where she was going, and experienced panic attacks as a result of her stroke. (Tr. 38.)

Prior to her March 2008, stroke, Plaintiff worked as a social worker for Cuyahoga County. (Tr. 43.) She worked with women who had tested positive for drug use during pregnancy. (*Id*.) Her job involved placing women in treatment programs, devising case plans, transporting clients to court and other appointments, and removing children from their mothers' homes when necessary. (*Id*.) After her stroke, which left her unable to transport clients, the County placed her in the records room, where she "lasted like, a day and a half" because she could not climb the ladder to put records away. (Tr. 44-45.) The County also offered her a "desk job," which she declined because she "didn't know the computer system or the computer programs" necessary to perform the job. (Tr. 45-46.) Ultimately, the County was not able to accommodate her restrictions and she received unemployment benefits. (Tr. 41-42.)

Plaintiff felt that she not able to work due to her problems with her right shoulder, which affected her right arm. (tr. 50.) She had been told by an orthopedic surgeon that

8

a screw from previous surgery on her right shoulder had moved and was interfering with her movement. (Tr. 50-51.) The orthopedic surgeon told Plaintiff that she would eventually need surgery, and advised her not to lift more than five pounds with her right arm. (Tr. 50.) Plaintiff was experiencing pain in her left arm resulting from overuse. (Tr. 52.) Her handwriting was generally illegible as a result of the stroke. (*Id.*)

Plaintiff felt that she could lift five pounds with her right shoulder, but only while lying down. (Tr. 54-55.) She could not lift a gallon of milk with her right arm. (Tr. 55.) Plaintiff could use both hands to lift a twelve-can pack of soda, but she would be afraid to lift anything fragile. (Tr. 55-56.) She generally did not use her right hand to do anything other than lifting weights in exercises a physician had prescribed for her. (Tr. 55.) Plaintiff did not go grocery shopping alone, but that was mostly due to the anxiety attacks that she experienced. (Tr. 55-56.)

Plaintiff's ability to walk had been affected by the stroke. (Tr. 57.) She tripped over her right foot because she no longer fully lifted it while walking. (*Id.*) She felt that she would walk the distance of a couple of houses down her street without running out of stamina. (Tr. 58.) Plaintiff could not stand for more than five or 10 minutes without experiencing lower back pain. (Tr. 59.) She also experienced discomfort while sitting for longer than 10 or 15 minutes. (Tr. 59-60.)

Plaintiff had been diagnosed with sleep apnea, but could not afford the CPAP machine without health insurance. (Tr. 60.) She experienced fatigue even after eight to 10 hours of sleep. (Tr. 63.) Plaintiff had also been diagnosed with clinical depression, and had taken medication for that condition for 20 years. (Tr. 64.) Since her stroke, she didn't "want to do anything" or "get up in the morning." (*Id.*) She also

9

took medication for anxiety. (Tr. 67.) Plaintiff had "a hard time reading and comprehending," which she attributed to difficulties with concentration caused by her depression. (Tr. 69.) She had also been diagnosed with agoraphobia. (*Id*.)

### 2. Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual of Plaintiff's age, education, and work experience:

> [T]his individual can perform light work with no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs; no hazards – that's no work at unprotected heights, no work around dangerous machinery; just occasional overhead lifting. They would have one additional or unscheduled break of five to 10 minutes per day. The individual's able to understand, remember, carry out simple instructions and can perform simple and more complex tasks in an environment with routine changes; no commercial driving; cannot perform any fast-paced work. This individual would also have occasional contact with the general public.

(Tr. 78-79.) The VE testified that the hypothetical individual would not be able to perform Plaintiff's past relevant work. (Tr. 79.) However, the VE opined that the hypothetical individual would be able to perform work as a bench assembler, wire worker or electronics worker. (Tr. 80.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

In his June 7, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1. Plaintiff last met the insured status requirements of the Act on December 31, 2009.

2. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of March 28, 2008 through her date last insured of December 31, 2009.

3. Through the date last insured, Plaintiff had the following severe impairments: stroke, shoulder pain, carpal tunnel syndrom and depression.

4. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she cannot perform climbing of ladders, ropes or scaffolds and no more than occasional climbing of ramps or stairs.  She cannot work around hazards, which means no work at unprotected heights and no work around dangerous moving machinery.  She can only occasionally perform overhead lifting.  She cannot perform fast-paced work.  She needs one additional and unscheduled break of five to 10 minutes per day.  Plaintiff is able to understand, remember and carry out simple instructions.  Plaintiff can perform simple and more complex tasks in an environment with routine changes.  She cannot perform commercial driving.  She is limited to occasional contact with the general public.

6. Through the date last insured, Plaintiff was unable to perform any past relevant work.

7. Plaintiff was born on November 23, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Plaintiff has acquired work skills from past relevant work.

9. Considering Plaintiff's age, education, work experience and RFC, Plaintiff had acquired work skills from past relevant work that were transferable to other

occupations with jobs existing in significant numbers in the national economy.

10. Plaintiff was not under a disability, as defined in the Act, at any time from March 28, 2008, the alleged onset date, through December 31, 2009, the date last insured.

(Tr. 69-76.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    Plaintiff's Assignments of Error**

Plaintiff argues that the ALJ erred in assessing the opinion of her treating psychiatrist., Dr. Mathew, and in concluding that Plaintiff was capable of light work despite her shoulder problems.  The Commissioner argues that substantial evidence supports the ALJ's conclusions.

**1.    Dr. Mathew**

Plaintiff argues that the ALJ erred in assigning little weight to the opinion of Dr. Mathew.  In his decision, the ALJ discussed Dr. Mathew's conclusions regarding Plaintiff's limitations:

> As for opinion evidence, little weight is given to the opinion by Shila Mathew, M.D., as to [Plaintiff's] mental ability to perform work-related activity.  It is inconsistent with the testing from 2008 that did not show significant deficits . . . . Dr. Mathew saw [Plaintiff] on December 17, 2009, and noted no thought disorder or cognitive changes.  Her insight and judgment were intact.  This appears to be the last time Dr. Mathew saw [Plaintiff] before her insured status expired on December 31, 2009.

(Tr. 23.)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's

opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. See *Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

  Here, Plaintiff's argument is two-fold. First, Plaintiff argues that the ALJ erred with respect to Dr. Mathew's opinion by failing to evaluate the opinion pursuant to all of the factors required by the relevant regulations. It is well settled that, where an ALJ "does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R.

§ 404.1527(d)(2)).  However, there is no requirement that an ALJ engage in an explicit discussion of each factor.  See *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 805 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion" – not an exhaustive factor-by-factor analysis.")  (quoting 20 C.F.R. § 404.1527(d)(2)) (alterations in original).

Here, Plaintiff specifically contends that the ALJ erred in failing to consider the length of Dr. Mathew's treatment of Plaintiff, Dr. Mathew's specialization, and the fact that Plaintiff was taking prescription medications to treat her depression.  Although the ALJ did not explicitly acknowledge either that Dr. Mathew had treated Plaintiff since January 2009 or that Dr. Mathew was a psychiatrist, he did offer good reasons to support his decision to assign little weight to Dr. Mathew's opinion.  He noted that it was inconsistent with the rest of the record, that Plaintiff had last treated with Dr. Mathew in December 2009 – nearly one year prior to Dr. Mathew completing the medical source statement, and that Dr. Mathew had noted neither cognitive deficits nor a thought disorder in December 2009.  (Tr. 23.)  Plaintiff does not explain how the ALJ's decision deprives her of the ability to understand his reasons for rejecting Dr. Mathew's opinion.  Because the ALJ's reasons "permit[] . . . a clear understanding of the reasons for the weight given" Dr. Mathew's opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010), the ALJ's decision satisfies the purposes of the controlling physician rule and, thus, provides no basis for remand in this case.

Second, Plaintiff argues that substantial evidence does not support the ALJ's assessment of Dr. Mathew's opinion because the ALJ did not consider medical

16

evidence supporting Dr. Mathew's conclusions.  Specifically, Plaintiff points to Dr. Mathew's notations, in December 2009, that Plaintiff was depressed, sad and tearful, and contends that these issues reflect a "tremendous change" from Plaintiff's mental status prior to her second stroke.  (Plaintiff's Brief ("Pl. Br.") at 10.)  She also argues that the ALJ erred in relying on the results of the 2008 cognitive testing, noting that the psychologist who performed that testing advised caution because Plaintiff experienced a stroke in between the two days of testing.

    Plaintiff's arguments are not well taken.  Although Plainitff reported increased anxiety and depression after her second stroke, Dr. Mathew's conclusions regarding Plaintiff's cognitive abilities did not change, as she consistently noted that Plaintiff did not have a thought disorder and that Plaintiff's judgment and insight were intact.  (Tr. 356, 337, 339.)  Plaintiff does not explain how her reports of increased depression and anxiety support Dr. Mathew's conclusions, in her November 2010 medical source statement, that Plaintiff had a poor ability in multiple work-related areas.  Further, the ALJ did not err in relying on the results of Dr. Benton's 2008 cognitive assessment of Plaintiff to conclude that Dr. Mathew's opinion was inconsistent with the record.  Although Dr. Benton warned that the results of the testing she performed should be interpreted "with some caution" as a result of Plaintiff's second stroke, she also opined that Plaintiff was "able to work," and that Plaintiff demonstrated only "mild impairment" or "mild problems," that Plaintiff's "[e]xecutive functioning appears to be mostly intact," and that Plaintiff was "able to learn and retain new verbal information well."  (Tr. 345.)  Dr. Benton made these observations after having performed some testing on Plaintiff after Plaintiff's second stroke.  Dr. Benton's notes demonstrate that she was aware that

17

Plaintiff had experienced a stroke after the first day of Dr. Benton's cognitive assessment.  Accordingly, Dr. Benton accounted for the effects of Plaintiff's second stroke in making her conclusions, and, thus, there is no basis for Plaintiff's argument that Dr. Benton's opinion was unreliable such that the ALJ erred in relying on it to support his conclusion that Dr. Mathew's opinion was not consistent with the record.

### 2.      Plaintiff's Shoulder

Plaintiff argues that the ALJ erred in determining that she was capable of light work, as the record contains evidence that Plaintiff's shoulder condition limited her abilty to lift and carry.  Specifically, Plaintiff points to her May 2008 diagnosis of end-stage osteoarthritis in her right shoulder, and her testimony regarding her limited ability to lift with her right arm and hand.  Plaintiff's argument is not well taken.

Although the record contains evidence that Plaintiff was diagnosed with osteoarthritis in her right shoulder, that diagnosis, alone, is not sufficient to establish disability.  *See, e.g.,* [Foster v. Bowen, 853 F.2d 483, 489-90 (6th Cir. 1988)](#) ("The mere fact that plaintiff suffered from a dysthmic disorder . . . does not automatically entitle plaintiff to the receipt of benefits.  Rather, . . .  plaintiff must show that she was *disabled* by her dysthmic disorder.") (emphasis in original).  Although Plaintiff bears the burden of establishing that her condition is disabling, *see, e.g.,* [Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999)](#) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is*

18

*proving the extent of his impairments*.") (emphasis added), she points to no medical evidence in the record establishing that her shoulder condition impaired her beyond the limits determined by the ALJ.  Rather, the physician who diagnosed Plaintiff in May 2008 noted that, although she might require surgery at some point in the future, Plaintiff's "excellent" range of motion precluded that necessity at that time.  (Tr. 392.)[2]

Further, to the extent that Plaintiff relies on her own testimony regarding her limitations, the ALJ concluded that she was not credible with respect to the severity of her shoulder impairment.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  See *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  See *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's

---

[2]  Plainitff also contends that the ALJ erred in relying on the agency consultant's physical RFC assessment to calculate Plaintiff's RFC because the consulting physician who prepared the RFC assessment failed to discuss Plaintiff's osteoarthritis.  The record reflects that, although the agency consultant mentioned that Plaintiff alleged disability on the basis of a "shoulder injury" (Tr. 413), that physician did not discuss the effect of that injury on Plaintiff's RFC.  However, even if the physician's failure to discuss this condition does constitute error, it is harmless, as Plaintiff does not point to any medical evidence in the record to support her assertion that her shoulder impairment was more limiting than the ALJ determined it to be.

19

allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id*.

Here, in concluding that Plaintiff was not credible with respect to the severity of her shoulder condition, the ALJ noted that Plaintiff was not receiving any "real current treatment for her shoulder," that the injury had not prevented her from working "in her adult life," and that she had only sought treatment for her shoulder on one occasion. (Tr. 22-23.) The record supports each of these observations. Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff's testimony regarding her limitations arising out of her shoulder condition was not credible. Plaintiff is not entitled to remand on this basis.

### VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: May 3, 2013